## WAITE *vs.* MERRILL & AL.

The covenant by which the members of the societies of shakers are bound to each other, is a valid instrument, obligatory on all who voluntarily enter into it.

In an action against the deacons of the society of shakers, touching the common property, the members of the society may be competent witnesses, being properly released.

THIS was an action of *assumpsit* against the defendants as trustees and deacons of the society of Shakers in the town of *New-Gloucester*, having the care and oversight of their temporal concerns ; and was brought to recover compensation for the services of the plaintiff about twelve years in that family or society, rendered while a professed shaker and member of the same family, from the time of his attaining the age of twenty one years.

At the trial, which was before *Preble J.* it appeared that the father of the plaintiff, who was also a shaker, carried the plaintiff with him into that family and bound him to the deacons as an apprentice, where the plaintiff continued to reside, except at some few intervals, from the age of fourteen years, working and farming, and clad like the other brethren of the same family. During this period he left the family twice ; and after having been absent a few months returned, asked pardon for his desertion, and was forgiven and received again into the family where he contin-

ued to reside as a professed shaker, till he was thirty two years old, when he finally left them.

It appeared, from the plaintiff's shewing that the principle of association in regard to their temporal concerns, was that of laboring for the common good of the society, each individual, whether sick or well, active or past labor, being clothed and supported out of the common stock. It also appeared that the shakers, while the plaintiff resided among them, did not encourage human learning ;—that neither the father of the plaintiff, nor the plaintiff himself thought favorably of such learning ;—but that all their young men, who wished it, were taught to read and write, and were instructed in arithmetic as far as the rule of three ;—that the Bible was furnished to all the members of the society, to be read and consulted at their pleasure ;—that the book published by the ministers of the society, called "The Testimony of Christ's second appearing," containing their covenant, and principles of faith and association, was placed within the reach of all, and all were encouraged to read it ;—that the plaintiff could read and write, and sometimes exhorted in their religious meetings ; and was a man of common talents. It was proved that the society took care to have each member well instructed in his particular department of labor ; but that the opportunities for acquiring general information among them were few ;—that while the plaintiff was with them they had no school except in winter evenings, and even this regulation was not uniform ;—and that all progress in human learning and science, beyond what has already been stated, was discountenanced by the elders and directors of the society, except in particular instances and for special purposes. And it appeared that the plaintiff, when he left the society, though well acquainted with farming, knew very little of the business transactions between man and man, and was totally ignorant of the comparative value of the common coins, not being able to distinguish one from another.

According to the rules of the society, its members were not permitted to mingle with the world ; nor to keep any memorandum or transact any business, but such as was prescribed to them by the deacons or elders ;—and if any one obtained money, he was not allowed to retain it for his own private or separate use.

It was fully proved by the concurring testimony of the witnesses on both sides,—several of those adduced by the plaintiff having formerly been shakers and members of this particular family, but afterwards having renounced that faith,—that all vice and immorality are disallowed by the society, and that integrity, uprightness, and purity of life are taught and enforced among them;—and that the precepts of the gospel, as they understand and interpret them, constitute, as they conceive, the foundations of their faith, and the rules of their practice. It was also proved that they teach and enforce the doctrine that the love of a brother or sister of the society should not exclusively centre in husband or wife, parent or child, individually ; but that all the brethren and sisters, whether standing in those relations or not, should be alike the objects of their affection.

An attempt was made to prove that the shakers held that a husband or parent belonging to their society was not bound to contribute to the support of a wife or child refusing to unite with them ;—but *Elisha Pote*, one of their elders, testified that they held no such principle, and that where such wife or children were unable to support themselves, the shakers always contributed to their support and relief.

It appeared that they are accustomed to receive to a noviciate or probation such persons as propose to unite with them ; and that in this way they receive parents with their children ; but that no person is considered bound to them till he signs the covenant ;—that every person who joins them after having completed his noviciate, and every minor among them upon his arrival at full age, must, by the standing regulations and orders of the society, sign the covenant, or leave them ; that neither force nor compulsion is used to induce them to subscribe ; but they are obliged to sleep and eat alone ; and are told that they must sign or leave them, and that if they should leave them they would be eternally miserable ; but no other obstacle is interposed to prevent them from leaving the society, if such is their choice. It was testified also that the rulers and elders of the society claimed to have knowledge or discernment of all that any brother or sister, whether present or absent, had been or might be doing ; of all

their secret sins and derelictions of duty ; of all their impure thoughts, and sinful or carnal desires ;—that they also claimed to have gifts, as from God ;—that their usual language in giving their orders was,—"I have a gift that you should do" thus ; and that the doctrine of implicit obedience to the rulers of the society is inculcated and enforced by discipline and ecclesiastical sanctions.

The defendants, on their part, produced their covenant or articles of association, of the following tenor :—

" Whereas, we the subscribers, of the plantation called Sabbath-day Pond, in the county of Cumberland, and State of Massachusetts, having received the grace of God in this day of Christ's second appearing, which hath separated us from the course of this world, and all natural relation, to take up our cross and follow Christ in regeneration, according to the light of God and revelation of Christ made known unto us. We feeling a desire to unite and gather ourselves together, in the order and form of a church in gospel order, agreeable to the order and covenant of the church of our communion at New Lebanon, in the State of New-York, gathered under the order and administration of Elder Joseph Meacham, whom we acknowledge to be our Elder and example in the gospel, and we were some time in the year of our Lord one thousand seven hundred and ninety four, received and gathered into relation, according to our own faith and understanding of the Church of Christ in gospel order, under the care and ministration of Elder John Barnes, whom we acknowledge to be our Elder and minister, being set apart to the work of the Ministry by the ruling Elders of the church of our communion at said New Lebanon, in which we gave ourselves and services, with all our temporal property freely, according to our own faith, to support one joint union and interest in all things, both spiritual and temporal, for the mutual good, support and comfort of each other, and for other pious and charitable uses, according to the order and covenant of the church. And whereas, Nathan Merrill and Josiah Holmes were chosen and appointed as deacons in the church, to take the care and management

of the estate or temporal interest of the church in trust ; to receive and hold in their said capacity all such real and personal estate with all gifts, grants or donations that may be devoted and given to the church ; the estate to be taken and holden by them, in their said capacity, in manner and form so as it may go and be holden in a line of succession, under the care and oversight of those members who may be appointed by the church, as their successors in the like office and trust ; *to be by them religiously improved, acco*rding to the true intent and meaning of the following covenant, which was committed to writing some time in the year of our Lord, one thousand eight hundred and one, and was signed by the members at large, and is as follows, viz:

" The Covenant of the Church of Christ at Sabbath-day Pond, so called, relating to the possession and use of a joint interest, in the year of our Lord 1794; the year in which most of the members of the church were gathered, in the following order and covenant ; was then and from time to time after made known and understood, received and entered into by us as members of the church, agreeable to our understanding of the order and covenant of a church in gospel order, for it was and is still our faith and confirmed by our experience, that there could be no church in gospel order according to the law of Christ, without being gathered into one joint interest and union, that all the members might have an equal right and privilege according to their calling and need in things both spiritual and temporal, and in which we have a greater privilege and opportunity of doing good to each other and the rest of mankind, and receiving according to our needs jointly and equally one with another in one joint union and interest, agreeable to the following articles of covenant:

" First.    The conditions on which we were received as members of the Church were in substance as follows :  All or as many of us as were of age to act for ourselves, who offered ourselves as members of the Church, were to do it freely and voluntarily as a religious duty and according to our own faith and desire.

" Secondly.    Youth and children, being under age, were not to be received as members, or as being under the immediate care and government of the church, but by request or free consent of

Waite *v.* Merrill & al.

both their parents, if living, except they were left by one of their parents to the care of the other, then by the request or free consent of that parent, and if the child have no parents, then by the request or free consent of such person or persons as may have a just and lawful right in care of the child together, with the child's own desire.

" Thirdly. All that should be received as members, being of age, that had any substance or property, that were free from debt or any just demands of any that were without, either as creditors or heirs, were allowed to bring in their substance, being their natural and lawful right, and give it as a part of the joint interest of the church, agreeable to their own faith and desire, to be under the order and government of the deacons and overseers of the temporal interest of the church, for the use and support of the church, and any other use that the gospel requires, according to the understanding and direction of those members with whom it was entrusted, and that were appointed to that office in care.

"Fourthly. All the members that should be received into the Church should profess one joint interest as a religous right ; that is, all were to have a just and equal right and privilege according to their needs in the use of all things in the Church, without any difference being made on account of what any of us brought in, so long as we remained in obedience to the order and government of the Church, and are holden in relation as members, are likewise equally holden according to their ability to maintain and support one joint interest in union and conformity to the order and government of the Church.

" Fifthly. As it was not the duty or purpose of the Church in uniting into Church order to gather and lay up an interest of this world's goods—but what we become possessed of by honest industry, more than for our own support, was to be devoted to charitable uses, for the relief of the poor, and such other uses as the gospel might require, therefore it was and still is our faith never to bring debt nor demand against the Church, or each other, for any interest or services which we have bestowed to the joint interest of the Church; but freely to give our time and talents, as brethren and sisters for the mutual good one of another, and other charitable uses according to the order of the Church.

" The foregoing is the true sense of the covenant of the church, in relation to the order and manner of the possession and use of a joint interest, understood and supported by us, the members, and we as fully and freely, in the most solemn manner, acknowledge and testify in presence of each other, and are free and willing to do it before all men if required, that it is that which we have kept and supported according to our understanding, from time of our first gathering, and still mean to support as that which we believe to be both our privilege and duty.

" And as we have received the grace of God in Christ by the gospel, and were called to follow him in the regeneration, we had not only a right as a religious society to gather into order according to our own faith, but also we believe it to be the duty of as many of us, that believe, as might be for the good of the whole, to gather into the order and covenant in which we now are. We believe we were debtors to God in relation to each other and all men, to improve our time and talents in this life in that manner in which we might be most useful. We have had the experience of twenty years' travel and labor, and received a greater confirmation and establishment in our faith, and that the order and covenant in which we have gathered and solemnly entered into, is a greater privilege, and enables us to be more useful to ourselves and others than any other state in our knowledge, and is that which is required and is accepted of God, and is that which we feel in duty bound according to our faith and understanding in the most conscientious manner to support and keep. And whereas we find by experience and travel for twenty years past that further provisions ought to be made for the better supporting and maintaining the joint union and interest of the church, and that each member may receive a full information and understanding of the order and covenant which we have solemnly entered with each other.

" We do therefore renew and confirm our said covenant with our aforesaid elder and minister John Barnes, and with each other. We have also chosen and reappointed Samuel Pote, together with Joshua Merrill, as deacons in the church, and do hereby intrust them with all the care and oversight of all the temporal

interest of the church, with full power to make all just and lawful defences in all cases in behalf of the church, for the protection and security of the joint interest and privilege of the church, as the gospel may permit, while acting in union according to the covenant and no longer ; and when by death or other means, one or both of the aforenamed deacons shall cease to act in said office, the power invested them shall be given to those members who may be chosen and appointed by the church as their successors in the like office and trust, while acting in union according to the foregoing covenant, and no longer. We do all appoint and request the aforesaid Samuel Pote, that he keep a copy, to be kept in a book provided for that purpose, a true and proper record of this covenant, together with all other acts, covenants, records, or matters, that may be necessary for the understanding and safety of the joint union and interest of the church, and we do by these presents solemnly covenant with each other for ourselves, our heirs and assigns, never hereafter to bring debt or demand against the said deacons nor their successors, nor against any member of the church or community, jointly or severally, on account of any of our services or property thus devoted and consecrated to the aforesaid sacred and charitable use. And we also covenant with each other to subject ourselves in union as brethren and sisters, who are called to follow Christ in regeneration, in obedience to the order, rules and government of the church. And this covenant shall be a sufficient witness for us before all men, and in all cases relating to the possession, order and use of the joint interest of the church.

"In testimony whereof, we have, both brethren and sisters, set our hands and seals this thirty first day of January, in the year of our Lord one thousand eight hundred and fourteen."

To prove that the plaintiff signed this covenant the defendants called *Elisha Pote*, one of the elders of the community of shakers, and several others who were members of their family; to whose admission the plaintiff objected on the ground of interest, arising from their being covenant members of the same family. Whereupon mutual releases were produced, by which the defendants

released the witnesses from all claims and demands to contribute, aid, or assist them in defending this suit, and from all other demands by reason of the same ;—and the witnesses released to the defendants all their interest in the common property in their hands by virtue of their office of deacons of the society, and in all other property which may appertain to the community of shakers, or to them as members of that society. The plaintiff still insisting on his objection, the Judge admitted the witnesses to testify, leaving their credibillity to the jury. These witnesses testified the fact they were called to prove ; and they were also permitted to speak of the faith and practice of the society with the same latitude which had been allowed to the plaintiff in the examination of his own witnesses.

Upon this evidence the Judge instructed the jury that the witnesses on the part of the defendants were competent ; but that they must judge what degree of credit was to be attached to their evidence ; for though mutual releases had been given, the witnesses still regarded themselves, and were *still* considered by the society, as shakers; but that independent of this circumstance, these witnesses stood unimpeached before them, and with these allowances they were, like other witnesses, *entitled* to be believed. He also told the jury that by the plaintiff's own shewing it appeared that he was a man of common abilities, and of competent understanding to bind himself at the time he signed the covenant, and that he must be presumed to have understood it ;—that from the evidence before them there was nothing which the law recognized as compulsion or undue influence, so as to avoid the act, if the signature were really the plaintiff's ;—that there was nothing in the covenant itself inconsistent with law, or morally wrong, which could render it void ;—and that therefore, however inconsistent with their own particular views of christianity or religion the faith of the shakers as developed in this cause might be, yet if they were satisfied that the plaintiff knowingly signed the covenant, their verdict ought to be for the defendants. And the jury found for the defendants. To these opinions and directions of the Judge the plaintiff excepted.

*Fessenden* and *Deblois* argued in support of the exceptions.

1. The contract itself is unconstitutional and illegal, and therefore void. If illegal in part only, it cannot be sustained. 1 *Dane's Abr. ch.* 1, *art.* 25, *sec.* 1 and 3. *Stackpole v. Earl* 2 *Wils.* 133. *Featherston v. Hutchinson Cro. El.* 199. 1 *Comyn on Contr.* 30. 8 *Mass.* 46. But it is contrary to the Constitution of Massachusetts, *Art.* 1, as it is in derogation of the right to acquire and possess property. It infringes the duties of children and parents reciprocally to support each other; and destroys the natural relation subsisting between them. All the property and services of the contracting parties are pledged to the association for their own support alone, no provision being made for the discharge of other obligations.

2. The contract is also void as being against good morals. The parties to this covenant bind themselves to observe the order and rules, and submit to the discipline of the Church. To ascertain these rules, orders and customs, by which the shakers are governed, not only is recourse to be had to their own printed manuals of faith and practice, and to such expositions as they may deem it for their own interest to give; but we are at liberty to advert to the practical application and effect of them among themselves. Otherwise any combination of men, however nefarious their real object may be, might by the public avowal of principles not contrary to law and good morals, escape merited punishment, and even under the protection of law, subvert the very foundations of society. Thus if such a combination should exist, having for its real object the propagation of atheism, or the practice of lewdness, or the destruction of the domestic relations; any individual, unwarily drawn into the confederacy, by publications and professions of a different character, ought to be admitted, by shewing its true tendency, to separate his property from that of the society, and be absolved from his engagements. Here the counsel cited many passages from the book called the Testimony of Christ's second appearing, to shew that marriage was not admitted among the Shakers.

Now the contract in this case, taken with its practical exposition by the Shakers themselves, goes to the destruction of

marriage, which is a moral as well as political institution. It is true that the chiefs of this association insidiously admit the lawfulness of marriage, provided it is undertaken from motives purely etherial, unmingled with any earthly ingredient whatever; but the known impossibillity of the condition renders the rule absolute and the prohibition universal. And so is it well understood. The very names of husband and wife are not known among them ; and even those already united in that relation, however advanced in life, as soon as they enter the pale of this self styled Church are separated forever by an unrelenting despotism. The authority of a husband to control, and even the right to counsel and advise his wife, or to afford her his sympathy and protection, are no longer his own ; but become vested in the elders of the family, to whose gifts every member is bound to yield implicit homage. The love they have hitherto had for each other they are now enjoined to extinguish forever ; and to regard their children as no longer their own. The husband and father surrenders his authority, the wife her deference, the children their obligation to obey, and all surrender their affections into the common stock, where they are lost as so many drops in the ocean. In their daily intercourse the endearing appellatives of parent and child are studiously rejected, as words without meaning. They have no ritual for the celebration of the ordinance of matrimony ; and should any among them enter into that relation, they are immediately expelled from the society, with the anathema of interminable perdition, for disobedience to the gifts of the elders.

Thus the Shaker's covenant is in substance and effect a contract that the husband will separate himself from his wife ;—that he will no longer love, cherish, or cleave to her alone ;—that if she cannot profess his faith, he will not support or protect her;—that she shall no longer receive his particular sympathy or regard ;—that he will renounce all parental authority over his children, and withhold from them his instruction, advice, and support;—that the wife and children shall in like manner renounce their reciprocal duties, and that those whom God has joined shall no longer be one. Can such a contract receive the sanction of

law ? *Worcester v. Eaton* 11 *Mass.* 368. *Smith & al. v. Poor & al. ib.* 519. *Coolidge v. Blake* 15 *Mass.* 429. *Jones v. Randall Cowp.* 39. *Page v. Trufant & al.* 2 *Mass.* 159. *Brown v. Getchell* 11 *Mass.* 11.

3. Its tendency to fetter and enslave the mind and person, is contrary to the genius and principles of a free government. In effect it is a contract that the party will always remain in the profession of his present faith; under the penalty of forfeiting all his estate should he become wiser and change his religious opinions. Thus, through the medium of interest, all freedom of thought, inquiry, and action, in a subject of all others the most important, are perpetually restrained. It is also a contract for unlimited servitude, without any other compensation than bare support ; and is therefore unconscionable, and void, being in derogation of the right of personal liberty.

Respecting the admissibility of the witnesses objected to, it was contended that the releases did not discharge their interest in the event of this suit. If the contract be valid, the property holden is the joint property of them all. The right to the personal services of each individual, is a right pertaining to every other party to the contract ; and which no member could discharge or release, except only so far as he was personally concerned. To be a good release from the whole contract, it should have been signed by all the parties to that contract, except those who were released. But the witnesses and their property are not affected by the releases produced. They are still bound to continue with the society, and labor for the common benefit, as before ; and are still entitled to support from the common fund, for this fund is alleged to be religiously consecrated to that, among other uses. Their case is like that of a partner not named in a suit brought against others of the firm. No releases between him and his copartners could make him a competent witness for them, if his interest still remained in the joint property. *Peake's Evid.* 147, *note a.* 2 *Root* 498.

The defendants have no power to release the fund from its liability to meet the plaintiff's demand. For by the terms of the covenant they have no separate property, nor can they have any.

They have a joint interest in the common fund, but it is not assignable. It is merely a right to personal sustenance, when unable to support themselves ; and this is all which the defendants or the witnesses can claim. Now the right to support being personal, cannot be claimed by substitute ; and therefore nothing passed by the release made by the witnesses to the defendants ; nor could the defendants, by their release to the witnesses, exonerate the common fund from the claim of the plaintiff. If he prevails, his judgment will and ought to be satisfied out of that property, in their hands. Equity would so decree it. Of course the witnesses would rely, for their support, upon a fund by so much diminished. Can any interest be more direct ?

The covenant itself is an anomaly in the history of contracts ; and if valid, is extensively mischievous in its tendency. By its terms the property is holden in trust, to be expended, first, for the support and maintenance of the contracting parties ;—and secondly, for charitable purposes at the discretion of the trustees. The interest of each individual being merely a right to personal sustenance, is not attachable ; and consequently any number of men ; placing their property in this situation, the income alone being sufficient to support them in splendor, may bid defiance to all subsequent creditors.

Against such a contract the party would be relieved in Chancery, and it ought not, therefore, to be supported in a court of law. *Boynton v. Hubbard* 7 *Mass.* 112. *Greenwood v. Curtis* 4 *Mass.* 93.

*Orr* and *Greenleaf*, for the defendants, said that whatever might be the peculiarities of the Shakers' faith, the subject was not within the cognizance of the civil tribunals. And if it were, it would appear that they hold no tenet, affecting the outward conduct; which has not for ages been sanctioned by the common law. It does not accord with the genius and spirit of our institutions, to look for men's faith beyond the circle of their practice ; and so far as this evidence is afforded, the case finds the moral conduct of the Shakers to be uniformly good.

Waite *v.* Merrill & al.

The covenant on which the defence rests, contains in itself nothing inconsistent with law, or morally wrong. It violates no right to acquire property; and it places those who leave the society, and thus abandon their share of the common fund, upon no other footing than every inhabitant of a town or parish is placed by law in relation to the public property, upon his removal from one town or parish to another. Nor is the faith of the party any more controlled by his interest in the one case than in the other, unless by the greater value of the estate. Men sometimes convey their whole property, and bind themselves to labor for the grantor during life, for no other consideration than their own support and maintenance; and the legality of such contracts is never doubted; nor are they distinguishable in principle, from the case at bar.

Neither is this a contract in restraint of marriage. The book referred to does not contain any reprobation of marriage itself, but only of the unhallowed motives with which it is often contracted. It denounces *all* impurity, as being destructive of the life of religion in the heart of man; and insists on the sacrifice of every pleasure in its nature polluting. And however some may err in the application of these principles to real life, their errors form no objection to the principles themselves.

But if marriage were forbidden to every shaker, under any circumstances, the legality of the covenant would not be affected by the prohibition, it being only a contract at will, continuing while the party shall continue in their communion. In this respect it stands upon the same basis with the contract that an apprentice shall not marry while in his master's service; the regulation that a scholar shall not contract matrimony during his connection with his college; and with devises of estates during widowhood; all which have been recognized as good in law.

Nor is its tendency to enslave the mind any stronger in principle than every other engagement or employment affecting in any degree the religion or conscience of the party. Such, virtually, are all contracts with clergymen for their settlement and support; and the tenures of some professorships in public seminaries, &c. in each of which cases the incumbent must adhere to the distin-

guishing tenets of his sect, or renounce his living. He accepts the benefice with a full understanding of the whole import of the condition, which it is reasonable he should be holden to perform.

If any part of the covenant is void at common law, as being immoral or against public policy ; it is void for that part only; there being an acknowledged difference in this respect between the common and statute law.   5 *Vin. Abr.* 98, *pl.* 7, and author-ities there cited.

And if the services of the plaintiff have been rendered under a contract wholly void as against the policy of the law, he cannot recover wages, being himself a willing party in the offence. The law does not lend its sanctions to enforce either side of a contract thus tainted ; but it leaves the parties as it finds them. *Bland v. Robinson Doug.* 679.

The admissibility of the witnesses they considered as settled by the case of *Anderson & al. v. Brock 3 Greenl.* 243.

The argument of this cause was had at the adjourned term of this court in *April* last ; and the opinion of the court was now delivered as follows, by

MELLEN C. J.   This case presents two questions for conside-ration.   1. Were certain members of the society of shakers properly admitted as witnesses ?   and 2. Were the instructions of the Judge to the jury correct ?

1. The objection to the admission of the witnesses seems to have been effectually removed by the releases given at the trial. A question of the same nature was settled by this court in the case of *Anderson & al. v. Brock 3 Greenl.* 243 ; the only differ-ence is, in that case the witnesses were introduced by the plain-tiffs ; and they and the witnesses executed mutual releases. This objection, therefore, is overruled.

2. The second deserves more consideration. Under the in-structions which the jury received, they have found that the plaintiff knowingly signed the covenant ; and by the report it ap-pears that he was a man of common natural abilities and under-standing ; and sometimes taught and exhorted in the religious meetings of the society ; and that he was more than twenty one

years of age when he signed it.    By thus signing, he assented to
all the terms and conditions specified in that covenant ; made its
stipulations his own, and agreed to conform to the rules and regu-
lations of the society in relation to its spiritual and temporal
concerns.    By the covenant, and also from the testimony of the
plaintiff's own witnesses, it appears that a community of interest
is an established and distinguishing principle of the association ;
that the services of each are contributed for the benefit of all,
and all are bound to maintain each, in health, sickness and old
age, from the common or joint fund, created and preserved by
joint industry and exertion.    And each one by the express terms
of the covenant engages " never to bring debt or demand against
" the said deacons nor their successors, nor against any members
" of the church or community, jointly or severally, on account of
" any service or property thus devoted and consecrated to the
" aforesaid sacred and charitable use."    Such are the facts as to
the contract into which the plaintiff entered when he subscribed
the covenant.    It is an express contract.    The plaintiff, in the
present action, however, does not profess to found his claim on an
express promise ; but he contends, that upon the facts proved
and disclosed in the report before us, the law implies a promise
on the part of the defendants to pay him for his services, although
they were performed for the society, of which the defendants are
officers, and not for them in their private capacity ; and although
such an implied promise is directly repugnant to the covenant, or
written contract.    Besides, it is clear from all the evidence in
the cause, that whatever services the plaintiff performed while
he was a member of the society, and remained and labored with
them, he performed in consequence of his membership, and in
pursuance of the covenant, in virtue of which he became a mem-
ber.    Now it is a principle perfectly well settled that where
there is an express contract in force, the law does not recognize
an implied one ; and where services have been performed under
an express contract, the action to recover compensation for such
services must be founded on that contract and on that only, unless
in consequence of the fault or consent of the defendant.    In the
present case there is no proof that the covenant has been violated

on the part of the society, or that the plaintiff had any right to waive that covenant and its special provisions, and resort to a supposed implied promise on which to maintain his action. But as the covenant refers to the order of the church and their peculiarities of faith ; and as at the trial both parties, without objection, went into an examination of witnesses, and thus obtained all those facts in relation to the society which are detailed in the Judge's report ; the argument of the counsel has been founded on all the evidence in the cause viewed in a body ; and, of course, in forming our opinion, we shall place it on the same broad foundation, without reference to technical objections, if any should present themselves. We are perfectly satisfied that the covenant was properly admitted as proof to the jury, to shew on what terms and considerations the services were performed by the plaintiff, for which he is now seeking compensation. We are also of opinion that the instructions of the Judge to the jury were correct, if the covenant signed by the plaintiff, taken in connection with those facts in the cause which are considered on this occasion, as a part of it, is a lawful covenant,—one which the law will sanction, as not being inconsistent with constitutional rights, moral precepts, or public policy. This leads us to the examination of the covenant, the principles it contains and enforces, and the duties it requires of the members of the society. The counsel for the plaintiff contends that the covenant is, for several reasons, void, and ought to be pronounced by this court to be a nullity.

It is said that it is void, because it deprived the plaintiff of the constitutional power of acquiring, possessing and protecting property. The answer to this objection is, that the covenant only changed the mode in which he chose to exercise and enjoy this right or power ; he preferred that the avails of his industry should be placed in the common fund or bank of the society, and to derive his maintenance from the daily dividends which he was sure to receive. If this is a valid objection, it certainly furnishes a new argument against banks, and is applicable also to partnerships of one description as well as another.

It is said that the covenant or contract is contrary to the genius and principles of a free government, and therefore void. To this it may be replied that one of the blessings of a free government is, that under its mild influences, the citizens are at liberty to pursue that mode of life and species of employment best suited to their inclination and habits, " unembarasssed by too much " regulation" ; and while thus peaceably occupied, and without interfering with the rights and enjoyments of others, they freely are entitled to the protection of so good a government as ours ; though perhaps all these privileges and enjoyments might be contrary to the genius and principles of an arbitrary government. But, in support of this objection, it is contended that the covenant is a contract for perpetual service and surrender of liberty. Without pausing to enquire whether a man may not legally contract with another to serve him for ten years as well as one, receiving an acceptable compensation for his services, we would observe that by the very terms of the fourth and fifth articles, a secession of members from the society is contemplated and its consequences guarded against in the fifth by covenants never to make any claim for their services, against the society ; and the fourth article speaks of a compliance with certain rules so long as they " remained in obedience to the order and government of the " church and holden in relation as members." Besides the general understanding and usage for persons to leave the society whenever they are inclined so to do, the plaintiff himself has in this case given us proof of this right, by withdrawing from their fellowship, and, now, in the character of a stranger to their rules and regulations, demanding damages in consequence of the dissolution of his contract. We, therefore, cannot consider the contract of a subscribing member as perpetual ; he may dissolve his connection when he pleases, though perhaps he may thereby surrender some of his property, as the consideration of his dissolution of the contract. In all this we see nothing like servitude and the sacrifice of liberty at the shrine of superstition or monastic despotism.

It is said the covenant is void because it is in derrogation of the inalienable right of liberty of conscience. To this objection

the reply is obvious ; the very formation and subscription of this covenant is an exercise of the inalienable right of liberty of conscience. And it is not easy to discern why the society in question may not frame their creed and covenant as well as other societies of Christians ; and worship God according to the dictates of their consciences. We must remember that in this land of liberty, civil and religious, conscience is subject to no human law ; its rights are not to be invaded or even questioned, so long as its dictates are obeyed, consistently with the harmony, good order and peace of the community. With us modes of faith and worship must always be numerous and variant ; and it is not the province of either branch of the government to controul or restrain them, when they appear sincere and harmless.

Again it is urged that the covenant is void, because its consideration is illegal, that it is against good morals and the policy of the law. We apprehend that these objections cannot have any foundation in the covenant itself ; for that is silent as to many particulars and peculiarities which the counsel for the plaintiff deems objectionable. The covenant only settles certain principles as to the admission of members ; community of interest ; mode of management and support ; acquisition and use of the property ; stipulations in respect to services and claims ; professions of a general nature as to the faith of the society, and a solemn renewal of a former covenant 'and appointment of certain officers. This is the essence of the covenant signed by the plaintiff ; and on this the defendants rely ; as a written contract of the plaintiff ; under his hand and seal, never to make the present claim ; and also as a complete bar to it. Now, what is there illegal in its consideration, or wherein is it against good morals or the policy of the law. It does not contain a fact or a principle which an honest man ought to condemn ; but it does contain some provisions which all men ought to approve ; it distinctly inculcates the duty of honest industry, contentment with competency, and charity to the poor and suffering. In this view of the subject, these objections vanish in a moment. But if we consider them as founded on the covenant, and all the evidence in the cause together, the result of the examination will not in a legal

point of view be essentially varied. It is certainly true that some articles of faith, peculiar to the society, appear to the rest of the world as destitute of all scriptural foundation; and several of their consequent regulations unnatural, whimsical and in their tendency, in some respects, calculated to weaken the force of what are termed imperfect obligations. Professing to exercise a perfect command over those passions, which others are disposed most cheerfully to obey, they, perhaps in so doing, may chill some of the kindest affections of the heart, gradually lessen its sensibility, and to a certain extent, endanger, if not seriously wound " the tender charities of father, son and brother." Perhaps celibacy, out of the pale of this church, has often the same tendency. It is true the mode of education and government may be too restrictive ; and the means used to preserve perfect submission to authority may be deemed artful, severe, and in some particulars highly reprehensible, especially in their pretended knowledge of the secrets of the heart. On the other hand it appears, as before stated, that benevolence and charity are virtues enjoined and practised ; and the plaintiff's witnesses, who had formerly belonged to the society for several years, testified that " all vice and immorality are disallowed in the society, and integ- " rity, uprightness and purity of life are taught and enforced " among them, and that the precepts of the gospel, as they un- " derstand and interpret them, constitute, as they conceive, the " foundations of their faith and the rules of their practice". As for their faith, it would seem from the volume which they have published, that it extends to unusual lengths ; and leads to what others, at once pronounce to be absurdities ; but this is not within our control : it is rightfully their own. But it is contended that according to the faith and principles and usages of the society, which are considered as referred to in the covenant as a part of it, the covenant amounts to a contract never to marry, which public policy will not sanction. We have before observed it is not a perpetual one; of course, at most, it is a contract not to marry while they continue members of the society ; but their faith does not require so much as this ; their principles condemn marriage in certain cases only ; that is, where it is contracted with

carnal motives ; and not purely with a view of complying with the original command "increase and multiply." It is true they do not believe that marriages are contracted (except in some solitary instances) without motives far less worthy and disinterested. As it regards those members of the society who are married ; though they may live separate, without cherishing the gentle affections, still such conduct violates no human law ; and however lightly they may esteem the blessings of matrimony, their opinions do not lessen the legal obligations created by marriage. Surely they may agree to live in different houses and without any communication with each other. Contracts of separation between husband and wife are not unfrequent ; neither are they illegal when made with third persons. This objection cannot avail, nor that which refers to the relation between father and son. Their principles require the circle of benevolence and affection to be enlarged ; but not that parental or filial tenderness should be destroyed or lessened. We must not overlook the distinction between duties of perfect and imperfect obligation ; the neglect of the former is a violation of law, which will render the delinquent liable in a court of justice to damages, penalties or punishment ; but the performance of the latter is never the subject of legal coercion. A man may be punished for defrauding his neighbour ; but not for indulging feelings of unkindness towards him ; or, in the hour of sorrow, withholding from him the balm of sympathy, consolation and relief. Though we may disapprove of many of the sentiments of this society in respect to the subject of education and discipline, yet as they steadily inculcate purity of morals, such a society has a perfect right to claim, receive and enjoy the full blessings of legal protection.

But, for the sake of the argument, let us suppose that the covenant or contract is illegal and void for the reasons which have been urged by the plaintiff's counsel ; what then will be the legal consequence ? will the action then stand on any firmer ground ? Though in the present case, the plaintiff does not demand of the defendants the repayment of a sum of money paid to them, on the ground that they have no legal right to retain it yet his demand is in principle, the same thing ; it is a demand of

compensation for services rendered, on the ground that, as the contract was unlawful and void, the value of those services may be recovered; that is, if he had increased the funds of the society by a sum of money, instead of his personal labors and services, the right to recover back the money, or recover the value of those services in money must be settled by the same principles of law in both cases. Now, what are those principles ? Before stating them, let it be again observed that the jury have found that the plaintiff knowingly signed this covenant which we are now considering in the light of an illegal and void contract ; and voluntarily joined this society and remained for several years a member, engaged with all the other members in all the transactions of it, and all of them *in pari delicto* ; for if the covenant is illegal and void, it is because the society who formed and signed it, is an unlawful society, and united for purposes which the law condemns. " If a wager be made on a boxing match, and on the " event happening the winner receives the money, it cannot be " recovered back by the loser ; for where one knowingly pays " money upon a contract executed, which is in itself immoral and " illegal, and where the parties are equally criminal, the rule " is *in pari delicto potior est conditio defendentis.*" 2 *Comyn on Contr.* 120. *Bull. N. P.* 132. *Cowp.* 792. To same point also is the case of *Howson v. Hancock* 8 *D. & E.* 575. Lord *Kenyon* there says, " there is no case to be found, where, when money " has been actually paid by one of two parties to the other on an " illegal contract, both being *participes criminis,* an action can be " maintained to recover it back again ; here the money was not " paid on an immoral, though on an illegal consideration, and " though the law would not have enforced the payment of it, yet, " having paid, it is not against conscience for the defendant to " retain it." *Lawrence J.* adds " In *Smith v. Bromly* Lord *Mans-* " *field* said that where both parties are equally criminal against " the general laws of public policy, the rule is, *potior est conditio* " *defendentis.*" See *Smith v. Bromly Doug.* 696. So also in *Engar & al. v. Fowler* 3 *East.* 222, it was determined that an underwriter could not maintain an action against brokers to recover premiums of reassurances declared illegal by statute.

Lord *Ellenborough C. J.* says, " We will not assist an illegal " transaction in any respect; we leave the matter as we find it."

So, an action will not lie to recover back money deposited for the purpose of being paid to one for his interest in soliciting a pardon for a person under sentence of death. 3 *Esp.* 253. No implied promise arises out of an illegal transaction. *Robertson v. Tyler* 2 *H. Bl.* 379. See also *Aubert v. Moor* 2 *Bos. & Pull.* 371 ; and *Mr. Dane,* in his *Abr.* 1 *Vol.* 194, says,—" And on the " whole, the sound principle is, the law will not raise or imply " any promise in aid of a transaction forbidden by the law of the " land." With these authorities before us, it would seem impossible to sustain the present action, even allowing the covenant and the society, by whom and for whose use it was formed, to be of the reprehensible and illegal character which has been given them. On the whole, we are all of opinion that there is a total failure on the part of the plaintiff, and there must be

*Judgment on the verdict.*