## BURT *v.* ONEIDA COMMUNITY, Limited, *et al.*

*(Supreme Court, General Term, Fourth Department.  November, 1891.)*

**1. ONEIDA COMMUNITY—PROPERTY RIGHTS—EXPULSION OF MEMBERS.**

In 1848 the Oneida Community, the object of which was to enable its members to live in community, observe a certain religion, and transact business in common, was founded. It was mutually agreed that each member, including such as should afterwards join, should contribute and convey his property absolutely to the association, and the individual property of each should be jointly owned by all. Plaintiff's father became a member while plaintiff was a minor, and conveyed his land to the community. By the rules of the community, the children of members became joint owners of the community property on reaching the age of 21 years. In 1864, plaintiff, while still a minor, together with the other members, executed an instrument in writing which he acknowledged as the terms of his connection with the community, which recited that, while a person should remain a member of the association, his subsistence and education should be held to be just equivalents for his labor, and that no claim of wages should accrue to him in case of subsequent withdrawal. Plaintiff received his support and a liberal education, and, after becoming of age, by his acts and acquiescence ratified the instrument of 1864. In 1875 plaintiff and the other members signed an agreement, which recited that "the education, subsistence, clothing, and other necessaries of life furnished to members" were "agreed and held to be just equivalents for all labor performed and services rendered and property contributed, no accounts being kept between any member and the community, or between individual members, and no claim for wages accruing to him or her in case of subsequent withdrawal." This agreement also provided that on the expulsion of a member for just cause the community should not be bound to refund any part of the property contributed by him, and, further, that no member should bring an action against the community for wages or compensation for services, or for the recovery of any property, nor make any claim or demand therefor. Plaintiff voluntarily, against the rules, left the community in 1880, and entered the employ of others, retaining his salary so earned, and was therefore expelled from the community. Afterwards the community formed a corporation, and conveyed its property to it. *Held*, that plaintiff was not entitled to recover compensation for his services to the community, nor to share in the community property.

2. SAME—SUBSEQUENT INCORPORATION.
    Even if plaintiff, in such case, were entitled to compensation for his services on the ground that he had not enjoyed the benefits secured to him by the agreement, he could not sue the corporation or the individual members of the community therefor, but his action should be against the community, with which the agreement was made.

3. SAME—DEFENSES OF PREDECESSOR.
    Even if plaintiff would have a right of action against the corporation for services rendered the community, on the ground that it was the assignee of the community, the corporation would be entitled to assert against the community all the conditions and stipulations named in the agreement between the community and plaintiff.

4. SAME—LIABILITY OF MEMBERS.
    If the individual members of the community were liable to plaintiff for his services, or their equivalent, he could not recover against a part only of such members.

5. REFERENCE—FINDINGS OF REFEREE—DECISION ON MERITS.
    After the close of the evidence before a referee defendants moved for a nonsuit. The referee made no decision, but stated: "I shall have to make findings either way, and, of course, it will come up hereafter." The parties acquiesced, and the referee made special findings, and dismissed the complaint. *Held*, that the decision of the referee must be taken as having been upon the merits on the evidence of both parties, and not as upon the motion for a nonsuit.

Appeal from judgment on report of referee.

Action by Charles A. Burt against the Oneida Community, Limited, John H. Noyes, and others. The complaint was dismissed, and plaintiff appeals. Affirmed. For appeal from taxation of the fees of the referee, see 12 N. Y. Supp. 806.

The complaint alleges that the Oneida Community, Limited, is a domestic corporation, organized under the laws of the state of New York, and doing business principally in the counties of Madison, Oneida, and Niagara. Also that about the year 1846 "plaintiff's father, the defendant Noyes, and others, organized an association, society, and partnership which they entitled the ' Oneida Community,' having its abode and principal place of business in the said county of Madison, for the following purposes, to-wit: *First*, to enable all of its members to live in community; *second*, that its members might observe and practice the new religion taught and founded by the defendant Noyes; *third*, for the transaction of a general manufacturing and agricultural business." The complaint alleges that "said Noyes founded said association upon the claim that he was inspired of God, and the members of said society and association were his followers, who believed in his inspiration, and accepted the doctrine and creed orally and in writing and print taught and expounded by him as their religion. * * * And said Noyes and his favorites ruled absolutely over the members of said association, and had absolute control of their property, persons, and liberties. That it was mutually agreed by and between the members of said association, as one of the conditions of the contract of association, as well as one of the tenets of their creed, that each and all of said members would contribute, assign, convey all his and their property absolutely to said association, and to each and all of its members, so that the property of each individual member should be jointly owned by each and all of the members of said association equally, and that each and every person admitted to membership in said association who owned no property and was without means should, upon becoming admitted to such membership, be equally the owner of all the property of said association, and of the property of each of said members, as fully and as absolutely as though he or she contributed, assigned, and conveyed property to said association, and to each and all of its members; and that those who had no property to contribute as aforesaid had equal interest, ownership, and rights, and were in all respects equally entitled to share in all the property, rights, ownership, privileges, and benefits of the property contributed by any or all the members who contributed property. And furthermore it was then and there mutually agreed by all the

said persons who organized said association that this contract would be of full force and binding, and equally apply to all members who thereafter joined as members said association, and who were obliged as a condition to admission as such member to absolutely and faithfully deliver, convey, assign, transfer, and set over all their property, if they had any, for the joint ownership, use, and benefit of each and all of said members of said association." It is also alleged "that there was no written or unwritten constitution, code, regulations, or by-laws ever adopted by or in force with the members of said association or community, and no specification of offenses or grounds of complaint for which a member might incur forfeit of his right and interest in the common property of his said membership." It is also alleged that the father of the plaintiff became a member of said association, and at that time was the owner of a farm and of mill property in Madison county, which he conveyed to the said association; and that, when plaintiff's father joined, the plaintiff was of the age of three years. It is also alleged that plaintiff was entitled by rules of said community and the contract made between the community "and his parents, as the minor child of members, to become a member thereof, and enjoy all the benefits thereof, and equally and jointly own the property belonging to said association upon reaching the age of twenty-one years." That about the year 1869 plaintiff was sent to a school attached to Yale College, to be educated. That "when he returned to his home in said community he respectfully presented his views, as he had the right to do, and then, there, and ever after incurred the displeasure of the defendant Noyes and his favorite followers, who ruled the entire community most tyrannically, and he was therefore cruelly persecuted by them for his opinion's sake. That about the year 1879, or a short time before, other members, who likewise became convinced of the need of reform, raised great objection to said Noyes and his favorites, who were called 'the inner circle,' and so rigorously opposed certain practices that it resulted in said Noyes and a number of his favorites withdrawing from said community, and fleeing or departing to Canada. That at said time said community was practically disorganized. That in the place of said Noyes and those of his favorites who had deserted, a temporary council was instituted to assist in the affairs of said community." That plaintiff "had no means to travel with in quest of health and rest, and he was offered the opportunity to sell wares by a firm in no wise connected with said community, which offered to allow him a certain percentage on sales which he might effect of their wares as compensation for his services." The complaint also alleges "that within a period of less than three months after he left on said western trip a large number of members of said community, without his consent, and without notice to him, illegally voted or declared said community dissolved;" and he alleges that defendants and some other members organized "themselves illegally into a joint-stock company or corporation under the corporate name of the 'Oneida Community, Limited,' and transferred all the businesses that were being carried on by said members and community to said corporation, and they and each of them have ever since conducted said business under said title." It alleges that the property so transferred "consisted of real and personal property of great value, to-wit, more than one million dollars, and which was chiefly the product of the industry and skill of plaintiff and the other members thereof, derived from their and his toil, economy, and good judgment." It also alleges that "some little time prior to said 16th day of October, 1880, said association had remained in a state of disorganization, without rules or officers, and said members have never since maintained an organization or system of government or rule, other than by and under such members who were appointed officers of said corporation, the defendant the Oneida Community, Limited." The complaint alleges that the defendants Portia G. Allen, George Campbell, and others enumerated (except the corporation) "were at the time hereinbefore mentioned

members of said organization and community, and now are stockholders of said Oneida Community, Limited, and have received since the 16th day of October, 1880, stock of said Oneida Community, Limited, and large sums of money, which equitably and lawfully belong to plaintiff, and were unlawfully paid to said defendants by the officers of said Oneida Community, Limited, all of whom were members of said Oneida Community." The complaint also alleges that the corporation was organized "without the consent, privity, or connivance of plaintiff, and against his will and consent, and unlawfully deprived him of his rights, and interfered with his property in transferring and conveying, and authorizing to be transferred, conveyed, and delivered, said property to said Oneida Community, Limited."

In the prayer of the complaint the plaintiff asks "that the alleged expulsion of the plaintiff as a member of said community be adjudged and decreed illegal, void, and of no effect, and that the plaintiff be adjudged to be a member of said community, and entitled to all the rights, privileges, franchises, and property belonging equally to each and every member of said community, and to him as such member, and to an equal share in all the property belonging to said community and its members." It also asks that the "alleged dissolution" be adjudged illegal, void, and of no effect. Also that the "said defendants, and each of them, and their attorneys, officers, and directors, agents, servants, or trustees, be adjudged to account for their management and disposition of the property of the plaintiff committed to their charge, or either or any of them, or of any property which was owned jointly by the members of the Oneida Community or association or society, and of the property which they have individually acquired or disposed of to others." Also that an "accounting be adjudged of the interest or share of the plaintiff in and to the property jointly owned by the members of the said community, society, or association, and fraudulently and illegally conveyed and transferred to the defendant the Oneida Community, Limited." Also that a receiver be appointed, and "that the said Oneida Community, Limited, its agents, trustees, officers, attorneys, and servants, each or any of them, may be enjoined and restrained from exercising any of the corporate rights, privileges, or franchises, and from collecting and receiving any debts or demands, and from paying out or in any wise transferring or delivering to any person any of the capital stock, money, property, or effects of such corporation, or of the property conveyed and transferred or delivered by said members of said Oneida Community of said property holders to said Oneida Community, Limited." Also "that the defendants may be adjudged to pay plaintiff such sum or sums of money as shall, upon the taking of such accounts, appear to be due said plaintiff from them."

The answer of the defendants contains a denial of the allegations of the complaint, and sets up the six-years statute of limitations; also the ten-years statute of limitations; and the defendants allege "that they were a duly and legally organized community, and a religious sect, having doctrines of faith, and a covenant in writing to and with each other, which was well known and understood by and between the plaintiff and the defendants, and were agreed upon and mutually assented to by each of them, and that the same was continued down to and through the time set forth in the plaintiff's complaint." The answer also alleges that "said plaintiff never had or brought any property or estate into said community, and did nothing more than to partly conform to its duties, faith, and covenants with said family, Oneida Community." And the answer further alleges that the plaintiff "fully ratified and confirmed all acts previously done in his behalf or upon his account, and for a valuable consideration executed an agreement in writing," which agreement is set out and known as the covenant bearing date August 18, 1875. It is also alleged that he executed the covenant "freely and without compulsion or duress, and with the full and complete knowledge of all the facts in the

premises, and with a perfect understanding on his part, * * * and in good faith on behalf of said community, and that upon their part the same was fully executed, and has been carried out; that the same was signed and assented to by each member of said community after arriving at the age of twenty-one years;" and it is alleged "that upon his ceasing to be a member of said community, by withdrawal or otherwise, plaintiff acquired no claim against said community or any members thereof, but wholly relinquished the same." The answer also alleges that "about the year 1880 the plaintiff voluntarily left and abandoned said Oneida Community, without the consent of said community and the members thereof; that when said withdrawal was made, under said written agreement (being the covenant aforesaid) plaintiff ceased to have any rights in any property belonging to said community at the time, or in pursuance thereof." The answer further alleges that "at the time of the commencement of this action the father and mother of the plaintiff were both living within the state of New York, and are of full age, and were then stockhòlders and owners in the defendant the Oneida Community, Limited, and that the plaintiff has acquired no right of or from them in any manner against said community or the members thereof, * * * or on account of the property, if any, contributed. or brought into said community by the father or mother of said plaintiff." It is also alleged that plaintiff voluntarily abandoned and left said Oneida Community a considerable time prior to the formation of the association hereinafter mentioned, known as the "Oneida Community, Limited." The answer admits "that the defendants Charles O. Kellogg, William H. Woolworth, John H. Noyes, and Erastus H. Hamilton had legal title to and were in possession of all the real and personal property claimed by plaintiff to form the property of the Oneida Community, and they deny that upon the 16th day of October, 1880, when said property was transferred by said holders thereof to said Oneida Community, Limited, that there·was any trust existing in favor of the plaintiff in said property, or that he had any right, legal or equitable, to, or lien upon, the same or any portion thereof." The answer of the defendants contains several other matters not deemed important to recapitulate here.

The covenant of August 18, 1875, which was signed by the plaintiff and others, is in the following language:

"Whereas, the society called the 'Oneida Community,' having its headquarters at or near the village of Oneida, county of Madison, and state of New York, and branches at Wallingford, state of Connecticut, and other places, was founded by John H. Noyes and others, for the purpose of religious fellowship and discipline; and whereas, it has been and is the agreement of members of the said Oneida Community, and of all its branches, by and with one another, that on the admission of any member all property belonging to him or her becomes the joint property of the community, and all of its members, and; the education, subsistence, clothing, and other necessaries of life furnished to members and their children in the community are agreed and held to be· just equivalents for all labor performed and services rendered and property contributed, no accounts being kept between any member and the community,. or between individual members, and no claim for wages accruing to him or· her in case of subsequent withdrawal; and whereas, it has heretofore been the practice of the community to keep a record of the estimated amount or value· of the property put in by each member joining the community, and to refund, the same or an equivalent amount of value, without interest, use, or increase,. in case of subsequent, voluntary withdrawal of the member, yet, as this prac-·, tice stands and has already stood on the ground, not of obligation, but of good-·, will and liberality, the time and manner of refunding such property or its· value resting entirely in the discretion of the community, through the voice of its members, who may also discontinue this custom of refunding at any time they may see fit, or refuse in any case to refund all or any part of such prop-

erty contributed by any member upon or after his or her withdrawal, at their pleasure; and whereas, it is also agreed that on the death of a member, or his or her expulsion for just cause, the community, its trustees, officers, or other representative are not bound to refund all or any part of the property contributed by such members to his heirs, executors, administrators, or assigns: Therefore, we, the undersigned, acknowledge the above as the terms of our connection with and membership in the Oneida Community, and all its branches now existing or that may hereafter exist, and we severally, for ourselves, our heirs, executors, administrators, or assigns, do agree and covenant with it and with its members, and with one another, and with the present property holders thereof, and their successors in office, that neither we, nor our heirs, executors, administrators, or assigns, will ever bring any action, either at law or in equity, or other process or proceeding whatsoever, against said community or its branches, or against the agents or property holders thereof, or any person or other corporation, for wages or other compensation for services, nor for the recovery of any property by us or either of us contributed to the funds or property of said community or its branches on or before our entering the same, or at any subsequent time, nor make any claim or demand therefor, of any kind or nature whatsoever.

"*Signed August* 18, 1875.        CHARLES A. BURT *et al.*"

At the close of the whole evidence the case states: "A motion was thereupon made for a nonsuit by the defendant. *The Referee:* I shall have to make findings either way, and of course it will come up hereafter." The referee found as a matter of fact that the covenant of August 18, 1875, was executed "by the plaintiff and his fellow-members, who were adults, including the property holders and the partners aforesaid; and said written instrument was styled the ' covenant,' and from its date the plaintiff and all his fellow-members continued to act under said instrument as expressing the terms of the contract between the Oneida Community and each member as understood by them;" and he also found "the said covenant or written instrument in substance represents a contract similar thereto, made by each member at the time of joining the association, each former contract being in its terms a parol contract or agreement and understanding made by each member joining before said several writings." The referee also found that "about the 30th day of July, 1880, because of the absence and engagement hereinafter mentioned, the counsel claiming to act for the Oneida Community passed and recorded in the books of the Oneida Community a resolution declaring the plaintiff expelled from the membership of said community;" and he also found as a matter of fact "that before the commencement of this action the plaintiff absented himself from said community, and omitted to perform or attempt to perform his contract with the Oneida Community, and entered into a contract with parties outside of the Oneida Community to serve them instead, and performed said contract with said outside parties; the same being inconsistent with his obligations to the Oneida Community, according to the terms of his contract with it." At the request of the plaintiff the referee found "that said Oneida Community or Association still exists and continues to be." The referee found as matter of law, viz.: "*First*, that the complaint is unproved in its entire scope and meaning; *second*, that the plaintiff is not vested with any several proprietary interest in the property mentioned in the complaint, or any part thereof; *third*, that the defendant the Oneida Community, Limited, is vested with the legal title to the property mentioned in the complaint, and the right to possess and hold the same under the transfer thereof to said Oneida Community, Limited; *fourth*, that the Oneida Community have not dissolved or committed any acts sufficient to constitute a sufficient cause for decreeing a dissolution of said association; *fifth*, that the plaintiff has entirely failed to prove or establish any cause of action in his favor, or against the defendants, or any of them; *sixth*, that the defendants are entitled to a judgment dis-

missing the complaint in this action, with costs against the plaintiff in favor of the defendants, and I direct judgment accordingly." Judgment was entered upon the report of the referee in Madison county dismissing the plaintiff's complaint "on the merits of the action," and that defendants recover the sum of $579.43 costs, which judgment was entered November 29, 1889, in Madison county clerk's office. On the 31st of December, 1889, the plaintiff appealed from the judgment. No motion was made to conform the judgment to the findings of the referee, or to strike out any portion of the judgment, but the plaintiff's appeal is from the judgment as entered.

Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

*George H. Hart,* for appellant.    *W. G. Tracy,* for respondent.

HARDIN, P. J.    1. We think the findings of the referee and the decision made by him must be taken as having been upon the merits. When the motion for a nonsuit was made at the close of the evidence no decision was made by the referee upon that motion. Apparently the parties acquiesced in the view the referee took, that the case was to be considered upon the merits upon the evidence given by either side. We thinks the case falls within the rule laid down in *Van Derlip* v. *Keyser,* 68 N. Y. 444. In that case it was said: "The referee has disposed of the case upon the entire evidence, making special findings of fact. It must be considered as decided upon all the testimony presented on both sides upon the trial before him. Any other course would leave out of view the testimony given by the defendants, and prevent a consideration of the same. Such a practice is not authorized in cases of a similar character. In order to raise a question of this character, and present the same for review, the case made up should show that it was raised and decided upon the trial, and before he had passed upon the facts. Assuming that upon a motion to dismiss the complaint at the close of the testimony a question arises the same as upon a motion for a nonsuit, a distinct ruling should be had at the time when the motion was made, or as of that time, and before the final submission of the whole case to the consideration of the referee. At least, he should have been requested to decide the motion as of that time, and, if he had refused to do so, an exception taken to such refusal. If the motion had been granted, an exception should have been taken to his decision. All of these matters should be made to appear in the case, and thus present the question. As this was not done, and an exception merely taken to the report of the referee upon the facts and to his conclusion of law, the point is not before us." See, also, *Pritchard* v. *Hirt,* 39 Hun, 378. Apparently the appellant acquiesced in the views suggested by the referee, that the case was to be disposed of upon the merits after a full consideration of all the evidence given before the referee. The case of *Place* v. *Hayward,* 117 N. Y. 487, 23 N. E. Rep. 25, differs from the one before us. There, at the close of the plaintiff's evidence, the defendant, without announcing that he rested the case, moved that the complaint be dismissed on the merits, and the referee granted the motion, and the plaintiff's counsel excepted; and it was held in that case that the action of the referee was equivalent to a nonsuit. In the case before us the motion was not granted, and the request that the decision be made at that stage of the case was given by the plaintiff, and no exception was taken to the action of the referee, who intimated that the case was to be considered on the merits.

2. From the evidence found in the appeal-book it is apparent that the plaintiff at the time of the commencement of this action had no legal title to the real estate referred to in the pleadings and mentioned in the evidence. At that time he was not a tenant in common or joint tenant with the corporation defendant or the individual defendants mentioned in the complaint, or with any one of them. This action cannot be maintained as one in partition for a division or sale of the real estate. Code, § 1532 *et seq.; Harris* v. *Larkins,*

22 Hun, 488.    The deeds of the several parcels of real estate were absolute in form to the property grantees without any conditions or declarations of trust, and the evidence does not indicate that the plaintiff was a tenant in common with the grantees named in the deeds, neither of the individual nor with the corporation organized under the statute of 1875.    There is no evidence showing any specific payments of money by the plaintiff for the lands or any part of them which were held by the individual grantees.    When the community was organized in 1848 plaintiff was an infant, having been born on the 9th of December, 1844, and was living with his parents, who united with the community, and he remained with them until he arrived at the age of majority, apparently under the direction and control of his parents, without having been emancipated, and without having any real estate, and without having any legal title to any compensation for services prior to his majority.    In 1864, April 30th, (which was prior to his majority,) he executed an instrument in writing with others, which was entered upon the original register of the Oneida Association, which contained the following words:  "On the admission of any member the property belonging to him or her becomes the property of the association.    A record of the estimated amount will be kept, and, in case of subsequent withdrawal of a member, the association, according to its practice heretofore, will refund the property, or an equivalent amount.    This practice, however, stands not on the ground of obligation, but of expediency and liberality, and the time and manner of refunding must be intrusted to the discretion of the association.    While a person remains a member his subsistence and education in the association are held to be just equivalents for his labor, and no accounts are kept between him and the association, and no claim of wages accrues to him in case of subsequent withdrawal.    We, the undersigned, acknowledge the above as the terms of our connection with the Oneida Association."    Subsequent to the plaintiff's execution of that instrument he remained in connection with the association down to August 18, 1875, apparently acquiescing and adopting the arrangement had and existing between the several members of the association.    The evidence of the acts and acquiescence of the plaintiff indicates an adoption and approval of the agreement of 1864 by the plaintiff after his majority, and is sufficient to indicate a ratification by him of the terms of the agreement already quoted.    He received his support, education, and acted in compliance with the practice mentioned, and the regulations named in the agreement of 1864.    Apparently he received a liberal education, being a student at a scientific institution connected with Yale College, New Haven, and his support and maintenance and expenses apparently were borne by the community, in accordance with the tenor and spirit of the agreement of 1864.    However, if any plausible doubt could be established or maintained in respect to the plaintiff's approval of the agreement of 1864, such doubt is fully removed by the agreement of August 18, 1875, which was executed by the plaintiff.    The latter agreement recites the organization of "the society called the ‘Oneida Community,'" and states that it was "founded by John H. Noyes and others, for the purpose of religious fellowship and discipline."    It also recites that "it has been and is the agreement of members of the said Oneida Community, and of all its branches, by and with one another, that on the admission of any member all property belonging to him or her becomes the joint property of the community and all of its members, and the education, subsistence, clothing, and other necessaries of life furnished to members and their children in the community are agreed and held to be just equivalents for all labor performed and services rendered and property contributed, no accounts being kept between any member and the community, or between individual members, and no claim for wages accruing to him or her in case of subsequent withdrawal."    It may be observed that the language just quoted, to-wit, "that the education, subsistence, clothing, and other necessaries of life fur-

nished to members and their children in the community are agreed and held to be just equivalents for all labor performed and services rendered and property contributed, no accounts being kept between any member and the community or between individual members, and no claim for wages accruing to him or her in case of subsequent withdrawal," is sufficient to indicate that the plaintiff consented to and accepted "the education, subsistence, clothing, and other necessaries of life" as "just equivalents for all labor performed and services rendered;" and the plaintiff, having thus stipulated what should be the compensation for his labor and services, is bound to accept, receive, and enjoy such compensation as the sole and only equivalent for his labor and services.

In passing, it may be observed that it is difficult, therefore, to suppose that the plaintiff is entitled to any other compensation for his labor and services performed by him for the community. This view bears significantly against the theory of the plaintiff that he has by his labor and services become entitled to any share or interest in the real estate acquired by the association. Surely, if the "education, subsistence, clothing, and other necessaries of life" are "held to be just equivalents for all labor performed and services rendered and property contributed," then the plaintiff received his pay, according to a stipulation binding upon him while he remained in the association. Having received his "just equivalents," it may be well doubted whether he ever became entitled to any other compensation, or any interest in any property, real or personal, as a compensation or equivalent for his labor and services. This view bears significantly against the idea of the plaintiff being an equitable owner of any of the property of the association. This view gains additional force from the subsequent language of the instrument of August 18, 1875. It declares that "it has heretofore been the practice of the community to keep a record of the estimated amount or value of the property put in by each member joining the community, and to refund the same, or an equivalent amount of value, without interest, use, or increase in case of subsequent voluntary withdrawal of the member; yet, as this practice stands, and has already stood, on the ground, not of obligation, but of good will and liberality, the time and manner of refunding such property or its value resting entirely in the discretion of the community, through the voice of its members, who may also discontinue this custom of refunding at any time they may see fit, or refuse in any case to refund all or any part of such property contributed by any member upon or after his or her withdrawal at their pleasure." Inasmuch as the plaintiff put in no property at the time of his joining the association, there is no occasion for the application of the practice mentioned in the quotation already made, and he has no occasion to call upon the community for the exercise of the "good-will and liberality" mentioned in the language of the instrument; but the further language used in the instrument of August 18, 1875, indicates that the plaintiff was not entitled to any ownership in the property of the association. It is stated, viz., "Whereas, it is also agreed that on the death of a member, or his or her expulsion for just cause, the community, its trustees, officers, or other representatives, are not bound to refund all or any part of the property contributed by such member to his heirs, executors, administrators, or assigns." This language seems to indicate that the association was not bound to refund to the plaintiff or any other member of the association any property contributed to the association, either upon the death of a member or upon his expulsion from the association for just cause. The subsequent language of the instrument commits the plaintiff to the tenor and spirit of all the language we have already quoted. The instrument continues: "Therefore, we, the undersigned, acknowledge the above as the terms of our connection with and membership in the Oneida Community and all its branches now existing or that may hereafter exist, and we severally, for ourselves, our heirs, execu-

tors, administrators, and assigns, do agree and covenant with it and with its members, and with one another, and with the present property holders thereof, and their successors in office, that neither we, nor our heirs, executors, administrators, or assigns, will ever bring any action, either at law or in equity, or other process or proceeding whatsoever, against said community or its branches, or against the agents or property holders thereof, or any person or other corporation, for wages or other compensation for services, nor for the recovery of any property by us or either of us contributed to the funds or property of said community or its branches on or before our entering the same, or at any subsequent time, nor make any claim or demand therefor, of any kind or nature whatsoever." The language which we have, just quoted is consistent with the idea that the plaintiff intended to accept "the education, subsistence, clothing, and other necessaries of life furnished to members and their children" as ample, full, and "just equivalents for all labor performed and services rendered." Having thus agreed to accept a specific compensation for his labor and services, it was harmonious therewith that he should agree to receive no interest in the property that had been accumulated by the association, and that he should expressly stipulate that neither he nor his executors or assigns "will ever bring any action, either at law or in equity, or other process or proceeding whatsoever, against said community or its branches, or against the agents or property holders thereof, or any person or other corporation, for wages or other compensation for services." The effect of this stipulation seems to be to cut off any claim "for wages or other compensation for services," and hence it stands in the way of his assertion that he is entitled by reason of his services to any part of the property held by the "property holders." It stands in the way of his maintaining an action against "any person or other corporation for wages or other compensation for services." It also stands in the way of the plaintiff's right of "recovery of any property * * * contributed to the funds or property of said community or its branches on or before our [his] entering the same, or at any subsequent time." He further stipulated and agreed that he would not "make any claim or demand therefor of any kind or nature whatsoever." Apparently the position now taken by the plaintiff by the scope of this action is in violation of the agreement to which he assented. Instead of the plaintiff's applying to a court of equity to sustain the agreement and to require the community to execute it on its part, he is in the attitude of asking a court of equity to give him relief in disregard of his express stipulations. So long as this agreement remained in force it is difficult to see how he had any right to maintain an action in equity against the "property holders" or against the community itself or "any person or other corporation" for the recovery of compensation for wages and services, or the equivalent thereof. It has been suggested that the community violated the terms of their agreement, and therefore the plaintiff may have relief, but the evidence does not indicate that the community was the first party who violated the agreement. The plaintiff voluntarily took himself away from the community in 1880, and kept himself from its privileges and from availing himself of its support and maintenance, voluntarily, for nearly four years, down to the time of the commencement of this action, which was the 14th day of January, 1884. Intermediate his removal to Chicago, in 1880, and the time when this action was commenced, he does not seem to have made any effort to receive and enjoy the support, maintenance, clothing, and necessaries mentioned in the agreement, nor to have demanded an opportunity to enjoy the same according to the tenor of the agreement existing between him and the association and its several members. We here forbear further comment on that aspect of the case, calling to mind that the community, as such, is not made a party defendant in this action. If the plaintiff would have a remedy for services and labor because he has

not enjoyed the specific compensation mentioned in the agreement, it seems his action should be against the community. If he has a claim for the equivalent of those because they have been refused to him, he should seek his remedy by an action against the association with which he contracted. We have before us only a corporation that was organized in 1880, under the statute of 1875, which in no way has undertaken to compensate the plaintiff for his labor and services, and apparently has not become obligated to him for the same or the equivalent thereof. If it be suggested that the corporation has become the assignee of the agreement made by the plaintiff with the community, then, as such assignee, it is entitled to assert against the plaintiff all the conditions and stipulations named in the agreement. If it be suggested that the individual defendants have become liable for the labor and services of the plaintiff, or the equivalent, such liability must be deemed to have accrued in common with the liability of numerous other parties, who are not made defendants in this action. It may be further suggested that in no event has the plaintiff a joint cause of action for his labor and services or the equivalent against the corporation and the individual defendants. It is a familiar principle that where there is an express agreement for compensation for labor and services to be rendered the law will not imply any other or additional one. *Waite* v. *Merrill*, 4 Me. 102.

During the very protracted trial the plaintiff, as a witness, gave very extensive evidence as to the organization, workings, theories, and doctrines and practices of the Oneida Community. He introduced into the case numerous circulars, annual reports, hand-books, and documents issued by the community at various times from 1848 down to 1880. From a perusal of them it is quite apparent that at no time did the community contemplate a legal liability on the part of the community to any of its members for labor and services beyond such compensation as might be derived from it in the way of "education, subsistence, clothing, and other necessaries of life furnished the members and their children in the community;" and the separate or individual or several ownership of any member of the association of any of the property or accumulations of the association was negatived in various ways and at various times. Among other extracts introduced by the plaintiff from the hand-book is one which states, "No one of himself owns anything." In another of the extracts from the hand-book introduced by the plaintiff it is stated, "The three community families (in all 273 persons) are financially and socially a unit." In another extract from the hand-book it is stated: "The Oneida Community rests upon a religious foundation. It was originated for the avowed purpose of applying the teachings of the New Testament to all the relations of life. Most of its original members were separatists from the orthodox churches of New York and New England, in consequence of having embraced new views of Christian doctrine." The plaintiff himself testified that "when parties became unruly, and refused to submit outright to the teachings of Mr. Noyes and his associates, they were in one instance voted as reprobates. That party was compelled to leave, and did leave. That was the additional penalty incurred. I was told by Mr. Hamilton, Mr. Cragin, and those who had us in immediate charge,—for Mr. Noyes during the earlier period didn't have the children in charge,—that if we didn't obey and conform to the rules—unwritten rules—of the community, established by their customs and instructions, that we should be compelled to leave the community to go into the outer world. The name given to the association, other than that of 'Community,' was the 'Kingdom of God on Earth,' the 'Kingdom of Heaven.'" And the plaintiff again testified: "They confessed their faith in Mr. Noyes; they confessed their absolute surrender to the spirit of the community; they confessed their obedience to Mr. Noyes; they confessed their faith in the divine inspiration of Mr. Noyes; they confessed Mr. Noyes to be the leader. That is what I mean by confession. Relating to

property, they confessed they all belonged to the church; that all their property and all their interests belonged to the Church of God, established by Mr. Noyes. They confessed repeatedly that they made a perfect and entire surrender of themselves and their property for the establishment of the Kingdom of God on Earth. That covers the general ground. Of course there were a hundred million confessions of that kind of varying form. The relation of each member to the common property was, the members were instructed by all the leaders that we would, as they called it, 'give our property to the Lord.'" The evidence does not disclose any independent articles of association at the time of the organization of the community, or written or formal constitution. It does disclose the circulars, hand-books, annual statements, and agreement of 1864, and the covenant of 1875, and other manifestations of the acts, practices by them as to religious, social, and business relations. It also discloses that the plaintiff was well educated at the expense of the community; that he was a man of more than ordinary intelligence, capable of comprehending the circulars, hand-books, agreements, practices, and pursuits of the community; that he voluntarily acquiesced in the rules and regulations of the community down to the year 1879, taking part at various times in the discussions, deliberations, and declarations of the organization, having at times supervision of various improvements, developments, structures, and business enterprises, and to some extent became a manager and leader, and has acted as salesman of the produce (canned goods) and other materials offered to the public for sale. The evidence warrants a conclusion that he, knowing of the contents of the agreement of 1864, after he had executed the same, acquiesced in its terms; knowing the language of the agreement of August 18, 1875, he acquiesced in its terms, and that the same was executed freely by him, without any fraudulent representations or misstatements being made to him in order to induce his execution thereof. Under such circumstances, he should be held to abide by the tenor and spirit of the agreement of 1864 and the agreement of 1875.

In *Austin* v. *Searing*, 16 N. Y. 121, the court, in dealing with constitutions and regulations of a masonic organization, said, in the opinion of SELDEN, J.: "It is only as contracts that these constitutions are in the least obligatory. * * * Viewed, then, as contracts, these constitutions must be subject to the same rules with all other contracts. It must be clearly shown that the defendants have assented to the written constitutions of these lodges." Plaintiff, having assented to the practices, customs, agreements, and covenants existing among the members of the community, may reasonably be held bound by the tenor and terms thereof. The United States supreme court, in *Goesele* v. *Bimeler*, 14 How. 589, had occasion to examine an organization not wholly unlike the one now before us. In that case "the articles of associations or constitutions of 1819 and 1824 contained a renunciation of individual property," and it was held "the heirs of one of the members who signed these conditions, and died in 1827, cannot maintain a bill of partition." Also it was further held, viz.: "The ancestor of these heirs renounced all right of individual property when he signed the articles, and did so upon the consideration that the society would support him in sickness and in health; and this was deemed by him an adequate compensation for his labor and property, contributed to the common stock. The principles of the association were that land and other property were to be acquired by the members, but they were not to be vested with the fee of the land. Hence, at the death of one of them, no right of property descended to his heirs. There is no legal objection to such a partnership; nor can it be considered a forfeiture of individual rights for the community to succeed to his share, because it was a matter of voluntary contract. Nor do the articles of association constitute a perpetuity. The society exists at the will of its members, a majority of whom may at any time order a sale of the property, and break up the association." In the

course of the opinion of Judge McLean, it is said of the plaintiff's ancestor, viz.: "He then signed the first articles, which, like the amended articles, renounced individual ownership of property, and an agreement was made to labor for the community, in common with others, for their comfortable maintenance. All individual right of property became merged in the general right of the association. He had no individual right, and could transmit none to his heirs. It is strange that the complainants should ask a partition through their ancestor, when, by the terms of his contract, he could have no divisible interest. They who now enjoy the property, enjoy it under his express contract." And again, he says: "As a general rule, chancery may not enforce a forfeiture; but will it relive an individual from his contract, entered into fairly and for a valuable consideration? What is there in either of these articles that is contrary to good morals, or that is opposed to the policy of the laws? An association of individuals is formed under a religious influence, who are in a destitute condition, having little to rely on for their support but their industry; and they agree to labor in common for the good of the society, and a comfortable maintenance for each individual; and whatever shall be acquired beyond this shall go to the common stock. This contr ct provi les for every member of the community, in sickness and in health, and under whatsoever misfortune may occur; and this is equal to the independence and comforts ordinarily enjoyed. The ancestor of the complainants entered into the contract fairly and with a full understanding of its conditions. The consideration of his comfortable maintenance, under all circumstances, was deemed by him an adequate compensation for his labor and property contributed to the common stock." Again, he says: "If members separate themselves from the society, their interest in the property ceases, and new members that may be admitted, under the articles, enjoy the advantages common to all." In that case the bill in equity was denied "on a deliberate consideration of all the facts in the case," the opinion concluding that "there is no ground to authorize the relief prayed for by the complainants." In *Hyde* v. *Woods*, 94 U. S. 523, the question arose as to the property rights of a member of the San Francisco Stock and Exchange Board, which was a voluntary association for business purposes, and it was held that a rule of the association was binding upon a member, and the court observed: "Though we have said it is property, it is incumbered with conditions, when purchased, without which it could not be obtained. It never was free from the conditions of article 15, neither when Fenn bought, nor at any time before or since. That rule entered into and became an incident of the property when it was created, and remains a part of it into whose hands soever it may come." In *Belton* v. *Hatch*, 109 N. Y. 593, 17 N. E. Rep. 225, a question arose as to the relation to each of the other members composing the association of the New York Stock Exchange, and the extent and the validity of the powers reserved by its constitution and by-laws. That was a voluntary association of individuals united without a charter in an organization for the purpose of affording to the members thereof certain facilities for the transaction of their business, and in the course of the opinion delivered it was said, viz.: "It cannot be said to be strictly a copartnership, for its objects do not come within the definition of one;" and it was further said that "whatever a member acquires is subject to the self-imposed condition that his title and the rights which accrue from his membership are regulated by, and are dependent upon, the laws adopted by the association, and expressly consented to by him when he joined." A similar case was presented to the court in *White* v. *Brownell*, 3 Abb. Pr. (N. S.) 318, and in that case it was held that the "open board of brokers in the city of New York is not a corporation, nor is it a joint-stock association; nor is it, as respects questions relating to the continuance or termination of membership in it, a partnership. That board is a voluntary association of persons who, for convenience, have associated to pro-

o

vide, at the common expense, a common place for the transaction of their individual business as brokers. The agreement which the members of such an association have made, upon the subject of membership, and what shall be the terms on which it shall be acquired, and the grounds and proceedings upon which it shall be terminated, must determine the rights of parties on that subject. A court of justice must recognize and enforce these provisions of the compact. It cannot substitute another contract for the one which the parties have made." In that case an injunction was dissolved which restrained the board from interfering with the privileges of a member of the board, and the decision made at general term was affirmed. 4 Abb. Pr. (N. S.) 162. DALY, F. J., said in the course of an elaborate opinion, viz.: "Individuals who form themselves together into a voluntary association for a common object may agree to be governed by such rules as they think proper to adopt, if there is nothing in them to conflict with the law of the land; and those who become members of the body are presumed to know them, to have assented to them, and they are bound by them. *Innes* v. *Wylie*, 1 Car. & K. 262; *Brancker* v. *Roberts*, 7 Jur. (N. S.) 1185; *Hopkinson* v. *Marquis of Exeter*, (London Times, Dec. 31, 1867,) L. R. 5 Eq. 63."

It may be fairly inferred or implied from the evidence that it was understood that members should labor jointly in the business carried on by the association, and give their entire attention to the business interests of the association. Apparently the plaintiff so understood the relation which he occupied to the community down to the year 1880; and he apparently understood that a membership could be severed by withdrawal or by death or by expulsion, and that, in case of voluntary withdrawal, a party would not be entitled to take anything with him, or to avail himself of the opportunities for support and maintenance or the use of the property of the association. It seems that February 15, 1880, according to the record of a business meeting held at that time, H. G. Allen, from a committee appointed to consider the best arrangements for selling the community's goods in the west, made a report, recommending that the plaintiff and one Hamilton "be appointed as general western agents for the sale of all kinds of our goods, with the understanding that they are to look after our interest generally in that quarter." The recommendation of the committee was adopted, and the plaintiff entered upon the performance of that duty, and continued until some time in the summer of 1880, and in April of that year the plaintiff applied to the business board for leave to "sell goods for other parties," and according to the book of records the plaintiff "moved that our agents be authorized to act as agents for the sale of goods manufactured by other parties in cases where such sale would not interfere with our own trade. The motion, causing considerable discussion, was finally laid on the table." It further appears by the book of record that on April 18, 1880, "Mr. Townley moved that the board take up the matter brought forward by Mr. Charles Burt April 4th, viz., the authorizing of our agents to sell goods manufactured by other parties in cases where such sales would not interfere with our own trade. The question, being put by the chairman, was decided in the negative." It appears that the plaintiff, on or about April 13, 1880, entered into a contract with the Erie Preserving Company, (a rival institution, located at Buffalo,) whereby he undertook to act as agent for the Erie Company in the city of Chicago and other western territory. When that fact became known in the community there arose a great deal of discussion and opposition and complaint, it being insisted that the plaintiff could not serve two masters, and that his connection with the Erie Company was a breach of his obligation to the community. However, he made his trip to the west, and entered upon the performance of his contract with the Erie Preserving Company, selling its goods. On the 15th or 16th of April, at the community, the plaintiff stated that "he met by appointment a representative of the Erie Company, and had arranged—had

made an agreement—with that company to make a trial trip. That he was to be paid $100 a month and expenses if it was simply a trial trip. If he continued in their service a year he was to receive $1,500 a year and expenses." That conversation was reported to the administrative council, which took action thereon: "The business board acted on it August 1st. The business board consists of all the members of the community." "There was no negative vote." The action apparently was taken after a committee had been appointed to confer with the plaintiff, to which committee he stated that he "had finally determined to leave the community and enter into a permanent engagement with another party on his own account." After that report was made, the following preamble and resolution was then adopted: "Whereas, Charles A. Burt has, of his own accord, and without the consent of the community, entered the service of another company for his own individual interest and profit, therefore, be it resolved that he has, by this act, severed his connections with the community, and can no longer be recognized as one of its members." Before the final action above stated was had, the plaintiff had returned temporarily to the community from his western trip, and had various discussions with various members in respect to his situation and relations, and he found there was great opposition to his course; and apparently he took that into consideration, and made his election and determination, as evidenced by his letter of July 26, 1880, which he wrote while he "was in the dwelling of the society." The following language is found in the letter: "July 26th, 1880. To the Council: On Wednesday next I propose to change my place of residence to Chicago. * * * The move I am about to make I consider in the light of self-protection. * * * I do not expect to make any settlement on leaving. The money that I earned in the service of another company I propose to take with me, on the ground that there is considerable doubt in the minds of many whether I am or have been for two months past a member of the community on account of my outside connections. Several persons in the council have expressed this opinion, and it is held by many others. If this view be true, the community certainly are not entitled to receive the earnings of an alien. As long as there is any doubt upon the subject, I will take the benefit of the doubt. Feeling as I do, if the community succeed in adjusting the conditions of things here so that I can return, I shall do so, and when I do return shall bring all my earnings." After delivering this letter to the council he went to Chicago about the 1st of August, or, as he says: "It may be that I left on the 28th of July, on Wednesday. I think I arrived in Chicago on the 1st of August." The witness adds that from that time until the present he has been engaged in the employment of other parties and for himself, although he subsequently sold some of the goods of the Oneida Community, having bought some goods on his own personal account, which he bought and paid for directly. On August 2d Mr. Campbell wrote, in behalf of the community, to the plaintiff, a letter, in which he stated: "The administrative council, Friday, July 30th, passed the following resolution, and instructed me, as secretary, to report it to you. It was also, in the meeting of the business board yesterday, accepted, and adopted as the minds of the business board: 'Whereas, Charles A. Burt, of his own accord, and without the consent of the community, entered into the service of another company for his own individual interest and profit, therefore, be it resolved, that he has by this act severed his connection with the community, and can no longer be recognized as one of its members.'" The plaintiff retained the money which he derived from the Erie Preserving Company and from such other sources down to the period of the commencement of this action. In his letter of July 26th he recognizes the fact that there is doubt about the propriety of his conduct, and that many of the members understood that he had voluntarily withdrawn himself from the community. Recognizing that doubt, he acts upon it by withdrawing the funds which he received from the Erie Preserv-

ing Company, which, if he was in full standing, and in full recognition of the obligations he had become under to the community, were the property of the community, and not his individual property. Apparently he took the safe side of the question by withholding the money, and apparently, by his intentions and acts, evidenced that he had severed his relations with them. Whether his expulsion was in the most formal and technical manner contemplated by the relations of the parties or not need not be conclusively determined. However, taking the action of the board of administrative council and of the several members of the community in that regard into consideration, and the declarations and acts of the plaintiff, it may be reasonably assumed that he withdrew himself from the community, and that at the time of the commencement of this action, which was in 1884, he had by his acts and acquiescence severed his relations with the community. It may be observed that he had never made a demand to be restored to the privileges and opportunities of the community which had been refused by it prior to the commencement of this action, but, as the community as a party is not named as a defendant, we forbear further comment upon the relations of the plaintiff to the association.

We have looked into the able opinion of the learned referee before whom this cause was tried, and much of the reasoning and logic of the opinion meets with our approval. We think no foundation has been shown by the plaintiff requiring the corporation or the individual defendants to make a specific performance of any obligation or contract on its or their part towards the plaintiff. Indeed, if such relief were sought by the plaintiff, it might be said that he did not act promptly. It was said in *Covart* v. *Johnston*, (Sup.) 15 N. Y. Supp. 786, that "one who would have specific performance should be prompt in claiming it. Here the plaintiff, on his own showing, has waited a year, and during that time has given no intimation that the contract had not been fully performed." A delay of the plaintiff in the case in hand seems to have been about four years, and we are of the opinion that neither of the defendants has any contract relation with the plaintiff which he is entitled to have specifically performed upon the evidence found in the appeal-book. A very large portion of the evidence given on the hearing before the referee consists of the testimony of the plaintiff. Some of his statements are contradicted by other witnesses, and some of his statements are somewhat inconsistent with some of the documentary evidence found in the appeal-book. Very numerous requests are presented (some 146) for additional findings, and exceptions were taken to refusals to find certain questions of fact. We do not deem it important to consider them in detail. It may be observed that the plaintiff was an interested witness, and, even though not contradicted, it was the province of the referee to determine whether full credence should be given to all his statements and declarations as a witness under all the circumstances surrounding him at the time of the trial. *Elwood* v. *Telegraph Co.*, 45 N. Y. 549; *Roseberry* v. *Nixon*, (Sup.) 11 N. Y. Supp. 523; *Dean* v. *Van Nostrand*, 23 Wkly. Dig. 97.

Very many rulings upon the admission and rejection of evidence were made during the progress of the very protracted trial. We have not deemed it important to comment upon them in detail. Suffice it to say that the learned counsel for the plaintiff says "it will be remembered that this is an equity case." *Forrest* v. *Forrest*, 25 N. Y. 501; *Clapp* v. *Fullerton*, 34 N. Y. 190; *In re New York Cent. & H. R. R. Co.*, 90 N. Y. 342. Our views, as already expressed, sufficiently indicate that in our opinion the plaintiff is not entitled to disturb the decision of the referee dismissing his complaint. Judgment affirmed, with costs. All concur.